IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-444 |
| LARRY LEONARD | : | |

**GOVERNMENT'S GUIDELINE ENHANCEMENT MEMORANDUM**

The United States of America, by and through its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and S. Chandler Harris and Eric D. Gill, Assistant United States Attorneys, submits this memorandum in support of its proposed leadership and victim-based enhancements in advance of the parties' evidentiary hearing scheduled for October 8, 2026.

## I. OVERVIEW

On May 11, 2026, defendant Larry Leonard pled guilty to conspiracy to transport and sell stolen goods in interstate commerce, in violation of 18 U.S.C. § 371 (Count One), interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (Count Two), and money laundering in violation of 18 U.S.C. § 1957 (Counts Three through Five), and aiding and abetting the same in violation of 18 U.S.C. § 2. The charges arise from the defendant's participation in a conspiracy to purchase millions of dollars worth of stolen retail merchandise through pawn shops collectively owned and operated by defendant Leonard and his charged coconspirator, Nat Leonard. Two of the pawn shops were located in Philadelphia, Pennsylvania and another was located in Wilmington, Delaware. The stolen retail merchandise was purchased by pawn shop employees primarily at Lou's Jewelry and Pawn, located in Wilmington, Delaware, and at K&A Money and Loan, located in the Kensington section of Philadelphia. As set forth in detail below,

employees at those locations purchased those items at defendant Leonard's direction and for his profit. Once purchased, defendant Leonard either transported himself, or directed his employees to transport those items to the third Leonard pawn shop, Society Hill Loan, located on South Street in Philadelphia. Once the items arrived at that location, employees would unload the stolen items, list the items for sale on Society Hill's eBay storefront, and then ship the stolen goods in interstate commerce.

Both the government and the United States Probation Office assert that defendant Leonard's actions in the conspiracy squarely support the USSG § 3B1.1(a) four level enhancement for leadership in the conspiracy, as well as the two-level enhancement for more than ten victims under USSG § 2B1.1(b)(2)(A)(i). Both of these enhancements are factually applicable, and supported by documentary and witness testimony, and should be applied to the defendant's final Sentencing Guideline calculation.

## II. <u>STANDARD OF PROVING ENHANCEMENTS</u>

The government bears the initial burden of proving contested Guideline enhancements ("USSG" or the "Guidelines") by a preponderance of the evidence. *US v. Badaracco*, 954 F.2d 928, 935 (3d. Cir. 1992) (holding "Under the Guidelines, 'the burden of ultimate persuasion should rest upon the part attempting to adjust the sentence. Thus when the government attempts to upwardly adjust the sentence, it must bear the burden of persuasion.'" quoting *US v. McDowell*, 888 F.2d 286, 291 (3d. Cir. 1989)).

## III. <u>THE DEFENDANT'S AGGRAVATING ROLE AND LEADERSHIP ADJUSTMENT</u>

The government submits that the facts the defendant agreed were true at his plea hearing, as well as the facts articulated in paragraphs 14 through 31 of the Presentence Investigation

Report ("PSR") clearly establish that the defendant qualifies for a four-level increase for leadership under Section 3B1.1(a) of the Guidelines.

USSG § 3B1.1(a) provides as follows: If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels. The enhancement can therefore be applied two ways to a person who is an organizer/leader of criminal activity that: i. involved five or more participants or, ii. was otherwise extensive. The Application Notes within the commentary to Section 3B1.1 provide the below guidance as to the multiple applications of this enhancement and states:

> 1. **Definition of "Participant".**—A "***participant***" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant.
>
> 2. **Organizer, Leader, Manager, or Supervisor of One or More Participants.**—To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more participants.
>
> 3. **"Otherwise Extensive".**—In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.
>
> 4. **Factors to Consider.**—In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or

> conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

### A. Facts in Support of the Leadership Enhancement

The defendant specifically objects to the application of the leadership enhancement in paragraphs B and L of his response to the Probation Office's draft PSR. *See* Ex. O ¶¶ B., L. The substance of both objections can be summarized as objecting to the text of the application, and in the objection stated in paragraph L, the defendant adds the following commentary, "Everyone involved in this case had an "understanding" they were dealing in stolen merchandise. At no point in time did Mr. Leonard direct anyone, who otherwise would not do so, to deal in stolen merchandise." *Id.* at ¶ L. The defendant proffers no facts to support his argument that the leadership enhancement does not apply, but explains each person was apparently otherwise operating independently in purchasing stolen items.

This explanation implies that each of the store employees were apparently pre-disposed to buy stolen merchandise, and that their pre-disposition to buy these items, at no profit to themselves, is how the conspiracy operated, and that the defendant's conduct and criminal culpability can be described to be as allowing the purchasing of stolen items occur in silence. This is an absurd minimization, and cannot be squared with the facts he admitted under oath were true, and the admissions and explanations offered in his letter to the Probation Office, attached here to as Exhibit P.[1]

The defendant entered a plea of guilty to the indictment on May 11, 2026. ECF 91. During his plea colloquy, the government provided a detailed factual recitation, which is attached hereto as Exhibit A, of the defendant's criminal conduct, which

---

[1] *See e.g.* "I knew. We knew enough to stop and I did not stop." Ex. P at 4.

included the following statements:

- "[T]he government's proof would show that that the defendant, had a controlling interest, or ownership interest in three pawn shops, one located in Delaware called Lou's; a second located in Kensington called K&A; and a third located on South Street called Society Hill Loan."

- "Additional testimony would have shown and would have been proved by cooperating co-defendants Matthew Goldstein and Tina Flood, who were employees at Lou's, that they would have testified that they knew that the items they were buying were stolen, they were doing it regularly, and they were doing it at the defendant's direction."

- "The government's proof would have also shown that at the defendant's own pawn shop located in Kensington, that his employee there, charged co-defendant, Mindi Leonard . . . was regularly coordinating with a separate type of thief, people the defendant referred to as 'mooks' . . . [t]he government's proof would have shown that once these individuals entered the store, they regularly brought in overnight bags or duffel bags full of brand new, high-end electronics. Those items were ultimately purchased by the defendant Mindi Leonard, working at the direction of defendant Larry Leonard."

- "The proof would have shown that the defendant, Mr. Leonard, orchestrated this scheme in (sic) conspiracy, that others that were involved within the conspiracy were working at his direction, and felt he was running the operation, that they had no other choice but to purchase these items."

- "[T]he government's proof would have also shown . . . that the eBay sales were regularly sent by thousands of dollars increments into a bank account, The Republic Bank of Chicago. Once received into that account, an account in the control of the defendant, Mr. Leonard . . . and the account was also used to support a Business Platinum American Express card that was in the defendant's control, as well as the control of co-conspirator Nat Leonard, as well as their wives."

- "The government's proof would have shown that the expenditures on the account, despite it being a business bank account, may have had every now and then some legitimate

> business expenditures that [the account] w[as] regularly used by the defendant and charged co-conspirators to fund lifestyle items such as concert tickets, golf trips, wine, and other high-end luxurious expenditures."

*See* Ex. A 1-9.

At the conclusion of the factual recitation, the following exchange occurred between the court, and the defendant:

- The Court: Mr. Leonard, did you hear what Mr. Harris on behalf of the government says the government was prepared to prove if the matter proceeded to trial?

- The defendant: Yes, I did, Your Honor.

- The Court: Is that what happened?

- The defendant: That is what happened, Your Honor.

- The Court: Did you do what the government says you did?

- The defendant: I did what the government said I did, yes, Your Honor.

*Id.* at 10.

The defendant's own statements to the Probation Office also further support the application of the Section 3B1.1(a) leadership enhancement as they plainly establish that the stores were under his control, and he is accordingly responsible for what took place there. In his September 2, 2026 communication to the Probation Office, the defendant made the following statements regarding his relationships with the three pawn shops utilized in the conspiracy and his involvement.

- "He left me his two Philadelphia stores in a mess carrying seven figures in bank debt. I could have filed for bankruptcy and walked away. I did not. Over the next seventeen years I refinanced multiple times and paid back every dollar."

- "In the early days customers brought electronics into my stores . . ."

- "I stepped back and let my employees handle it . . ."

> • “We liked being the owners when things were good. We cannot pretend we were not owners when this happened.”
>
> • “I regretted it and kept doing it anyway. I stood at that mirror for four years. I knew. We knew enough to stop and I did not stop.”
>
> • “After the seizure, I closed the Kensington store and then later the Delaware store . . .”

Ex. P 2-4.

Putting his admissions aside, a common-sense application of the factors set forth in the commentary to USSG § 3B1.1(a) uncontroversially support the leadership enhancement described and applied in the PSR.

As noted above, Section 3B1.1 lists a set of non-exhaustive factors for the Court to consider when determining whether the defendant is an organizer/leader for the purposes of the enhancement. Relevant for consideration here are the factors bulleted below:

- the exercise of decision-making authority,
- the nature of participation in the commission of the offense,
- the recruitment of accomplices,
- the claimed right to a larger share of the fruits of the crime
- the degree of participation in planning or organizing the offense,
- the nature and scope of the illegal activity,
- and the degree of control and authority exercised over others.

Applying these non-exhaustive factors to the facts of this case clearly supports a finding that the defendant meets the criteria for an organizer/leader of criminal activity.

1. *Exercise of Decision-Making Authority*

The defendant either owned outright, or exercised effective control, over all three pawnshops involved in the conspiracy. Regarding two of the stores involved – Lou's and K&A – the defendant exercised direct and total control over them. He dictated payroll, he dictated staffing, and while he had managers who worked under him who managed store operations, final decision-making authority about legal and illegal store operations and strategy was his, and his alone. Text messages taken from the defendant's phone as well as co-conspirator statements also confirm that the defendant was regularly updated about store purchases, both legal and illegal, and further coordinated obtaining cash needed to buy more stolen items from the boosters or mooks, and was responsible for ensuring that both stores under his daily control were equipped to continue to buy stolen items. His control and decision-making authority is best exemplified by his organizing a meeting with co-conspirators Nat Leonard and Mathew Goldstein to discuss an upcoming Delaware law change which would have prohibited his employees at Lou's from purchasing new in-box items without a receipt. Compliance with the law would effectively shut down his illegal buying operation in Delaware because none of the boosters his employees were purchasing from had receipts. Defendant Leonard called the meeting, and declared that the conspirators would direct certain boosters to Society Hill Loan, and continue purchasing stolen items there. While the defendant did not exercise direct control over the operations of Society Hill Loan, he did exercise control over how the conspiracy operated at that location. Since Society Hill Loan was used primarily to receive, list, sell, and ship stolen items, the defendant's influence there is demonstrated by his regularly documented trips to the location with car loads full of stolen items. Video surveillance evidence shows defendant Leonard arriving sometimes twice a day and unloading, or overseeing Society Hill Loan employees unloading his car.

2. *The Nature of Participation in the Commission of the Offense*

Larry Leonard's participation in the conspiracy he pled guilty to is as foundational to the enterprise, as it was critical to its execution. Leonard oversaw all aspects of the enterprise. He directed store employees to buy stolen items. He set policy as it related to purchase price of the stolen items; he troubleshot issues or otherwise directed what items; and how many items he was wanted to purchase; he ensured each store had enough cash to continue to purchase stolen items; he was regularly briefed and informed on when new purchases would be made; he coordinated transfer of the items to Society Hill; he controlled the bank account which received eBay proceeds of the items purchased on the eBay page; and he profited, to the tune of millions of dollars, from the sale of these items. There is no element, outside of directly buying items from drug addicts – an activity he left to his store employees – that independent evidence doesn't confirm he controlled or directed.

3. *Recruitment of Accomplices*

While the defendant did little to recruit accomplices in the traditional sense, it is abundantly clear that he used his employees to execute the conspiracy, and to enrich himself.

4. *Claimed right to a larger share of the fruits of the crime*

Larry Leonard's claim to a larger share of the profits of the conspiracy, compared to others involved, is indisputable. One need look no further than the spending represented on his monthly American Express statements than to assess what his share of the fruits of the scheme were. As an example, the American Express statements which support counts three through five of the indictment are attached here as Exhibits B-D, and demonstrate that the defendant entitled himself to conspiracy proceeds that charitably could be described as disproportional to his co-

defendant, Nat Leonard. Exhibit B indicates that defendant Larry Leonard incurred new charges in the amount of $31,615, compared to Nat Leonard's $7,409. Ex. B at 2. Exhibit C, an invoice for the very next month, indicates that defendant Larry Leonard incurred new charges in the amount of $21,451, compared to defendant Nat Leonard's $5,949. Ex. C at 3. Finally Exhibit D indicates that defendant Larry Leonard incurred new charges in the amount of $24,351 compared to defendant Nat Leonard's $7,269. Ex. D at 6.

His share to a larger portion of the proceeds is also demonstrated by the profit, or lack thereof, of his employee co-conspirators. Outside of receiving their standard payroll, and other legitimate income, Mindi Leonard, Mathew Goldstein, and Tina Flood did not receive any proceeds of the conspiracy.

5. *Degree of Participation in Planning or Organizing the Offense, Nature and Scope of the Offense, and Degree of Control Over Others*

Similar to the other factors, the defendant bears significant responsibility for planning and dictating the scope of the fraud scheme. While he left the work of actually purchasing the items to his store employees, defendant Leonard involved himself in every other aspect of the scheme to ensure maximum profit. He supplied his employees with cash to purchase the stolen items, directed that he be provided with regular updates of business operations, including totals of stolen item purchases, he directly participated in or managed to logistics of moving the stolen items to Society Hill, he dictated when and how to report the items into LEADSOnline, and he formulated a strategy to work around the enactment of the Delaware law to ensure the conspiracy could continue. In short, there is no aspect either in plan, execution, or staffing of the conspiracy that defendant Leonard did not control.

**B. <u>The defendant's criminal activity involved five or more participants.</u>**

The second half of the analysis of the leadership enhancement concerns whether or not there are five or more participants that were led by the defendant. The application notes define a "participant" as a "person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1(a) cmt. n.1. Further, the defendant can count as a participant for purposes of this enhancement. *United States v. Wilder*, 15 F.3d 1292 (5th Cir. 1994).

Four other codefendants have been charged and pled guilty as a result of their participation in the criminal conspiracy. So has defendant Leonard. A plain language interpretation of the application note supports a finding that Nat Leonard, Mindi Leonard, Mathew Goldstein, and Tina Flood are participants, as the term is defined in the commentary. Further, the defendant also counts as participant. This equals five individuals who meet the definition of a participant for purposes of the enhancement, and therefore, this element is established. Furthermore, these individuals are not the only persons who could considered "participants" under the Guidelines. The PSR notes that additional employees – H.S. and E.H. – who were employed at Society Hill, regularly participated in the scheme by unloading the stolen merchandise from defendant Leonard, cataloguing the items, listing them for sale on eBay, and shipping the items once sold. PSR ¶ 22.

## IV. <u>ENHANCEMENT FOR TEN OR MORE VICTIMS</u>

The PSR also properly applies a two-level increase for ten or more victims. USSG § 2B1.1(b)(2)(A)(i) states "If the offense [] involved 10 or more victims . . . increase by 2 levels." The Application Notes of Section 2B1.1 further define a victim as "any person who sustained any part of the actual loss determined under sub-section (b)(1) . . . 'Person'

includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."

The application of this enhancement is supported by the letters attached hereto as Exhibits E through N which detail how each of these retailers were affected by the Leonards' fencing operation. Here, the victims are the large retailers who lost millions of dollars' worth of merchandise that was stolen by the boosters or "mooks" and then sold to the pawnshops controlled by the defendant (Lou's, K&A, and Society Hill). The affected retailers and supporting documentation include: 1) Walmart; 2) Target; 3) Acme; 4) Safeway[2]; 5) Home Depot; 6) Best Buy; 7) Harbor Freight; 8) Giant; 9) CVS; and 10) Rite Aid; and 11) Macy's. At the evidentiary hearing, the government will also present evidence about another victim, Bed Bath & Beyond.

## V. <u>GOVERNMENT'S ANTCIPATED FACT WITNESSES</u>

The government's anticipated witnesses at the evidentiary hearing, and a summary of their expected testimony, are set forth below.

### A. <u>Mathew Goldstein</u> (approximately 45 - 60 minutes on direct)

Mathew Goldstein is expected to testify to his relationship with the defendant, who is his uncle. He is expected to testify how long he has worked in the Leonard pawn shops, who had decision-making authority in the pawn shops, and specifically how the conspiracy operated at Lou's in Delaware. Goldstein is expected to testify that purchases from the boosters increased over time, that Leonard directed his to only enter a few of the purchases into LEADSOnline, and to exclude a majority of them. Goldstein is expected to testify as to the regularity of booster

[2] Both Acme and Safeway have the same parent company are collectively represented in Exhibit E.

purchases and the volume of new-inbox stolen items he was purchasing at defendant Leonard's direction. He is also expected to testify to defendant Leonard's role in the conspiracy regarding transporting the items to Society Hill Loan, where they were eventually sold on eBay. Goldstein is also expected to testify about the 2024 Delaware law change, the defendant's request that they meet about the law change, and his suggestion to circumvent the new regulations to ensure the conspirators could continue to buy stolen items. He is further expected to testify as to the amount of money he earned from the eBay sales, which was approximately $0.

**B. <u>Tina Flood</u> (approximately 45-60 minutes on direct)**

Tina Flood is expected to testify as to her relationship with the defendant, which was her status as an employee, to defendant Leonard's status as her boss. Flood is expected to testify about how long she worked for defendant Leonard at Lou's in Delaware, and her activities in the conspiracy, which largely consisted of buying stolen items at the direction of the defendant. She will testify about conversations she had with the defendant about the purchasing of stolen property, including the 2024 Delaware law change, and the defendant's proposal to circumvent that law. She will testify that her salary was often delayed at the direction of Leonard so that he could allocate more of the businesses' cash to buying stolen merchandise. Last, she will discuss that she and Mattew Goldstein gave daily updates to the defendant about the transactions that occurred at Lou's. She is further expected to testify as to the amount of money she earned from the eBay sales, which was approximately $0.

**C. <u>Mindi Leonard</u> (approximately 60 minutes on direct)**

Mindi Leonard is expected to testify as to her relationship with the defendant, who is both her boss and the cousin of her late husband. Mindi Leonard is expected to testify about how long

she has worked for defendant Leonard, and how the fraud scheme operated at K&A. She is expected to testify about purchasing stolen items from people referred to as "mooks" and how these individuals differed from neighborhood boosters. She is further expected to testify about the regular cash shortages at K&A, and how she was required to report to the defendant the cash dollar amount of stolen purchases she made from the mooks on a daily or otherwise regular basis. Mindi Leonard is expected to testify about the process by which she would facilitate the purchasing of stolen items from the "mooks," where the items were stored once purchased, and how the defendant built a room inside K&A to use in their dealings. Mindi Leonard is expected to testify about how the defendant would regularly transport items they purchased from the "mooks" to Society Hill Loan, as well as items that defendant Larry Leonard held back so he could sell himself. She is also expected to testify regarding how she profited from the conspiracy, which was approximately $0.

**D. Nat Leonard (approximately 60 minutes)**

Nat Leonard is expected to testify to his role in the conspiracy, which related primarily to conspiracy operations at Society Hill, a store in his day-to-day control. Nat Leonard is expected to testify that he, along with his employees, which included H.S. and E.H. served as the distribution hub for the stolen items. Specifically he is expected to testify regarding how often stolen items were delivered, how the items were catalogued, listed, and sold on eBay. He is also expected to testify about the conspirators relationship with J.D., a wholesale purchaser of stolen items. He is expected to testify regarding defendant Larry Leonard's control over payroll, effective control of the pawn shops' bank accounts, as well as the conspirators collective use of a business platinum American Express card. Nat Leonard is expected to testify regarding his

participation in a meeting with defendant Larry Leonard and Mathew Goldstein regarding the 2024 Delaware law change, and defendant Larry Leonard's proposed solution to ensure the conspirators could continue to purchase stolen items.

**E. Michael Sordini (approximately 30-45 minutes)**

Michael Sordini is expected to testify regarding his role in the investigation, which included organizing and leading various merchants who were collectively being victimized by the defendant's criminal conspiracy. Sordini is expected to testify as to the number of retailers involved in investigating the Leonard criminal enterprise, and will offer testimony and documentary evidence from the retailers who were identified as victims in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

S. CHANDLER HARRIS
ERIC D. GILL
Assistant United States Attorneys

Dated: October 6, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Guideline Enhancement Memorandum has been served via electronic filing upon all defense counsel of record for defendant Larry Leonard by the Court's ECF notification system.

S. CHANDLER HARRIS
ERIC D. GILL
Assistant United States Attorneys

Dated: October 6, 2026